IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| VERONICA ESQUIVEL, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) No. 06 C 5737 |
| | ) |
| INTERNATIONAL UNION OF OPERATING | ) |
| ENGINEERS, LOCAL 150, | ) |
| | ) |
| Defendant. | ) |

## MEMORANDUM OPINION AND ORDER

Veronica Esquivel ("Esquivel") worked as an administrative assistant for the International Union of Operating Engineers, Local 150 ("Union"). During her tenure there another employee acted toward her in ways that she felt were so inappropriate as to rise to the level of sexual harassment. After she filed a charge of discrimination with the Illinois Department of Human Rights and received a right-to-sue letter from the Equal Employment Opportunity Commission, Esquivel brought this action against the Union, asserting that she was subjected to a gender-based hostile work environment and then to retaliation once she complained of the harassment.

Now moving for summary judgment pursuant to Fed. R. Civ. P. ("Rule") 56, the Union disclaims liability. For the reasons stated in this opinion, its motion is granted.

### Summary Judgment Standard

Every Rule 56 movant bears the burden of establishing the absence of any genuine issue of material fact (Celotex Corp. v.

Catrett, (477 U.S. 317, 322-23 (1986)). For that purpose courts consider the evidentiary record in the light most favorable to nonmovants and draw all reasonable inferences in their favor (Lesch v. Crown Cork & Seal Co., 282 F.3d 467, 471 (7th Cir. 2002)). But to avoid summary judgment a nonmovant "must produce more than a scintilla of evidence to support his position" that a genuine issue of material fact exists (Pugh v. City of Attica, 259 F.3d 619, 625 (7th Cir. 2001)) and "must set forth specific facts that demonstrate a genuine issue of triable fact" (id.). Ultimately summary judgment is warranted only if a reasonable jury could not return a verdict for the nonmovant (Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986)). What follows then is a summary of the facts, viewed in the light most favorable to Esquivel.[1]

## Background

Esquivel embarked on her administrative assistant job at the Union in September 2002 (Compl. Ex. A at 1). In late 2003 one of the Union's business agents, Daniel Regan ("Regan"), began to act toward her in a way that she persuasively labels as sexual harassment (U. St. ¶13). Because the result here does not rest

---

[1] Esquivel's and the Union's memoranda will respectively be cited "E. Mem. --" and "U. Mem. "--." As for the LR 56.1 statements of fact, the Union's will be cited "U. St. ¶--" and Esquivel's responsive and additional statements will be cited "E. Resp. St. ¶--" and "E. Add. St. ¶--." Where the factual assertion in the Union's statement is not denied by Esquivel, only the original statement will be cited.

2

on the quantum of harassing conduct, there is no need to repeat the graphic particulars set out by Esquivel.

Some earlier background is useful, however, to provide context for Esquivel's familiarity with the procedures for reporting sexual harassment at the Union. She claims that shortly after she began to work there she was sexually harassed by a different Union business agent, Fenton Cross ("Cross")(U. St. ¶9). Esquivel did not formally report the incident, but instead told another assistant in the office, Amy Posateri ("Posateri"), what had occurred (U. St. ¶9). Posateri took it upon herself to inform Alexia Kulwiec ("Kulwiec"), an attorney for the Union and designated sexual harassment liaison, of Esquivel's problems with Cross (U. St. ¶9). Kulwiec then met with Esquivel and asked if Esquivel wished to make a sexual harassment complaint, but Esquivel refused because Cross had apologized to her and she felt the matter was resolved (and, indeed, she had no further issues with Cross)(U. St. ¶10). Esquivel felt that after the incident with Cross the business agents' demeanor toward her changed and they were less friendly, but things went back to normal within a few months (U. St. ¶12).

To move forward to Esquivel's situation with Regan, about December 2004 she complained about Regan's conduct to the office manager, John Garza ("Garza")(E. Resp. St. ¶ 14). At some point she also complained to another business agent, Joe Ward, and he

3

told Regan to cease his harassing conduct (E. Resp. St. ¶14). Within a short time after that conversation Esquivel told Ward that the situation with Regan had improved, and Ward considered the matter closed because he heard no more about it (E. Resp. St. Ex. B at 22-23). Esquivel complained of the harassment to Posateri as well, although the record does not reflect when (E. Resp. St. ¶14).

On May 5, 2005 Esquivel complained to Union attorney Ken Edwards ("Edwards") and asked him to prepare a sexual harassment complaint (E. Resp. St. ¶¶ 14, 18; E. Add. St. ¶12). On the following day Esquivel initiated the formal sexual harassment complaint procedure by meeting with Melinda Henzel ("Henzel"), an attorney and sexual harassment liaison for the Union, along with Steve Cisco ("Cisco"), the recording-corresponding secretary for the Union (E. Resp. St. ¶14; E. Add. St. ¶13). Before that Esquivel had not made a formal complaint to Henzel because she was afraid of reprisals from Regan and the Union (E. Add. St. ¶9).

Because Esquivel did not feel that the Union was doing anything about her report of sexual harassment, on May 9, 2005 she submitted her resignation effective May 20 (E. Add. St. ¶16). Three days later Garza told her that it was in the best interests of all involved that she not finish out her remaining time with the Union, and he told her to leave the premises that day (E.

Add. St. ¶17). When she left she was given her final paycheck through May 20 and a check covering her unused vacation and personal days (Compl. Ex. A at 12).

On August 23, 2005 Esquivel filed a charge of discrimination with the Illinois Department of Human Rights, checking the boxes for "sex," "retaliation" and "other" (U. St. ¶21). After receiving a right-to-sue letter, she initiated this action (U. St. ¶22).

## Hostile Work Environment

To establish successfully that her work environment was hostile, Esquivel must show that (Phelan v. Cook County, 463 F.3d 773, 783 (7th Cir. 2006):

> (1) she was subjected to unwelcome sexual harassment in the form of sexual advances, requests for sexual favors or other verbal or physical conduct of a sexual nature; (2) the harassment was based on her sex; (3) the sexual harassment had the effect of unreasonably interfering with her work performance in creating an intimidating, hostile, or offensive working environment that seriously affected her psychological well-being; and (4) a basis for employer liability exists.

Our Court of Appeals has set the bar high in hostile work environment cases, stating that "[t]he workplace that is actionable is one that is 'hellish.'" (Perry v. Harris Chernin, Inc., 126 F.3d 1010, 1013 (7th Cir. 1997)). But even assuming arguendo that Esquivel clears that hurdle, she still is unable to recover here because no basis for employer liability exists.

Employer liability for sexual harassment is incurred in

5

either of two circumstances: (1) when the harasser is plaintiff's supervisor (that scenario creates strict liability) or (2) when the employer is negligent in either discovering or remedying the harassment directed at plaintiff by a fellow employee (Phelan, 463 F.3d at 783-84). Because it is undisputed that Regan was not Esquivel's supervisor, she must proceed on the other path of employer negligence. In that respect it has often been repeated that "the law against sexual harassment is not self-enforcing" (Perry, 126 F.3d at 1014, quoted in Parkins v. Civil Constructors of Ill., Inc., 163 F.3d 1027, 1038 (7th Cir. 1998)). When a mechanism to report harassment exists but the victim does not use it, an employer is not liable for co-employee sexual harassment (Durkin v. City of Chicago, 341 F.3d 606, 612-13 (7th Cir. 2003)).

For an employer to be held liable under the negligence theory, the employer must have been apprised of the harassment and must then have failed to take appropriate remedial measures (Rhodes v. Ill. Dep't of Transp., 359 F.3d 498, 506 (7th Cir. 2004)). And an employer is generally not viewed as having been apprised of the harassment unless the employee makes a concerted effort to inform the employer of the problem (id.).[2]

---

[2] Although an employer may be charged with constructive notice when the harassment is sufficiently obvious (Rhodes, 359 F.3d at 570), Esquivel does not argue constructive notice. Nor does it appear that the acts of harassment rose to that level of blatancy (see, e.g., E. Resp. St. Ex. B at 23).

6

In the absence of such knowledge, an employer need do no more than promote general anti-harassment policies and training (id. at 507). To that end an employer discharges its legal duties "if it takes reasonable steps to discover and rectify acts of sexual harassment of its employees" (Parkins, 163 F.3d at 1032 (internal quotation marks omitted)). And the caselaw in that regard, as exemplified by Parkins, prescribes the necessary analysis.

First it must be determined "whether the employer has designated a channel for complaints of harassment" (id. at 1035). If an employer has set up a "point person" to accept complaints, employees can be expected to submit complaints to that person (id.). If no such point person has been designated, notice of harassment is given by complaints lodged with "a department head or someone that the complainant reasonably believed was authorized to receive and forward (or respond to) a complaint of harassment" (id. (emphasis in original, internal quotation marks omitted)). As for the quantum of information necessary, a complainant must give "the employer enough information to make a reasonable employer think there was some probability that she was being sexually harassed" (id.).

Sexual harassment was not treated as an off-limits topic at the Union. Seminars and meetings on sexual harassment were held to train employees about proper office conduct (Compl. Ex. A at

7

3; E. Resp. St. Ex. B at 23), and the Union's personnel manual (which Esquivel received) detailed the procedure for reporting sexual harassment (U. St. ¶6; U. St. Ex. 3 at Art. IX).

Under that procedure such harassment was to be reported to the business manager (William Dugan) or to a sexual harassment liaison (Kulwiec or Henzel)(U. St. ¶6). When Esquivel was asked in her deposition whether she had followed that policy in reporting harassment by Regan, she responded that she had not been given a chance to follow it (U. St. Ex. 1 at 74). But that is squarely at odds with her own conduct: She lodged a complaint with one of the Union's sexual harassment liaisons on Friday, May 6, 2005, but then tendered her resignation the following Monday (E. Add. St. ¶¶13, 16). And during the brief interim period she made no inquiries about the status of her complaint (U. St. ¶20).

Employers are not omniscient. They cannot be charged with knowledge of every act of sexual harassment that occurs between employees. As indicated earlier, when sexual harassment training and a procedure for reporting harassment are in place, an employer cannot be held liable for asserted co-employee harassment that is not brought to its attention.

To hold the Union liable here would transmogrify the relevant test from one of negligence to strict liability. Once again, to minimize the likelihood of harassment the Union

8

conducted mandatory sexual harassment seminars for its employees. Beyond that it provided an easy-to-follow procedure for reporting sexual harassment, actually identifying liaison persons to facilitate that procedure. Esquivel chose not to follow that procedure for reporting sexual harassment until she spoke with Edwards on May 5, 2005 and asked him to prepare a sexual harassment complaint. Indeed, she admits as much in E. Mem. 4, 6 and 12.

Although Esquivel may have complained of Regan's conduct to others in the office before that date, the Union cannot be charged with knowledge of the harassment based on those conversations. And there is nothing in the record (other than Esquivel's unsubstantiated opinion, which cannot be credited as admissible evidence) to suggest that the Union, once properly notified of the problem, was negligent in following up on Esquivel's complaint (remember that she herself did not follow up or ask what was being done about her complaint).[3]

Absent the requisite showing of negligence, Esquivel cannot park responsibility on the Union's doorstep for any sexual harassment she experienced. Summary judgment must be granted on that score.

---

[3] Nor does Esquivel provide a basis for her asserted fear of reporting Regan's conduct, especially in light of Kulwiec's prompt earlier response to second-hand information that Esquivel had an incident with Cross.

9

Retaliation

Esquivel also contends that the Union somehow retaliated against her after she complained of Regan's sexual harassment,[4] conduct forbidden by Title VII (42 U.S.C. §2000e-3(a)). As succinctly described in Durkin, 341 F.3d at 614:

> Retaliation occurs when an employer takes an adverse employment action against an employee for opposing impermissible discrimination.

Retaliation may be proved by either the direct or the indirect method (id.; Rogers v. City of Chicago, 320 F.3d 748, 753 (7th Cir. 2003)).

Esquivel has chosen to employ the direct method (E. Mem. 7). That requires the employee's presentation of direct or circumstantial evidence that (Dorsey v. Morgan Stanley, 507 F.3d 624, 627 (7th Cir. 2007)(brackets in original)):

> (1) [s]he engaged in statutorily protected activity;
> (2) [s]he suffered an adverse action taken by the employer; and (3) [there was] a causal connection between the two.

Adverse employment actions must be "materially adverse"--a concept "meaning more than a mere inconvenience or an alteration

---

[4] Although the Union includes an argument in its memorandum denying that Esquivel was retaliated against for complaining of her incident of sexual harassment with Cross, Esquivel makes no mention of it. Perhaps for good reason--the only arguably adverse affect that she suffered following her complaint (or non-complaint) about Cross was that other employees were less friendly to her for a brief period. That occurred in late 2002, and Esquivel did not file a charge until 2005--well beyond the time when the 300 day limitation under 42 U.S.C. §2000e-5(e)(1) had long since expired.

of job responsibilities" (Ribando v. United Airlines, Inc., 200 F.3d 507, 510 (7th Cir. 1999)(internal quotation marks omitted)). Such actions usually involve economic injuries, although certain instances of non-economic adversity may qualify (Whittaker v. N. Ill. Univ., 424 F.3d 640, 647-48 (7th Cir. 2005)). Actionable retaliation involves employer conduct that would "dissuade[ ] a reasonable worker from making or supporting a charge of discrimination" (id. at 648). Examples of adverse employment actions include termination, demotion, decrease in compensation, material loss of benefits or significantly diminished material responsibilities (Ribando, 200 F.3d at 511).

Esquivel's charge of retaliation is fatally flawed because of the total absence of any adverse employment action taken against her.[5] It will be remembered that she first initiated the formal complaint process on Thursday and Friday, May 5 and 6, 2005 (E. Mem. 6). Immediately thereafter, on returning to work on Monday, May 9, she tendered her resignation effective May 20 (U. St. ¶19).

Esquivel's claim of adverse employment action rests on her having been told on May 12 that she should not come in to finish out her time at the Union (E. Mem. 6-7). Instead she was then

---

[5] If Esquivel had attempted to prove retaliation by the indirect method the result would be the same, because that too requires a showing of an adverse employment action (Rhodes, 359 F.3d at 508).

11

given two checks, one for her unused vacation and personal days and the other for her pay through May 20, 2005 (Compl. Ex. A at 12).

That contention, with its assertion that she was "involuntarily terminated" on May 12, is sheer nonsense. After all, she herself had already resigned.[6] To argue that her being paid in full without having to report for work for her final 1-1/2 weeks is somehow equivalent to retaliatory conduct is truly absurd.

## Conclusion

Esquivel has not successfully raised even a supportable inference that the Union is liable for the complained-of sexual harassment or that it retaliated against her. Because there are no genuine issues of material fact, the Union is entitled to a judgment as a matter of law. This action is dismissed in its entirety.[7]

---

[6] Esquivel does state that she was "probably frightened or panicky" when she tendered her resignation (E. Mem. 5), as if that somehow discounts the effectiveness of her resignation. It does not.

[7] Even though the issues posed by this case admittedly do not contribute significantly to the corpus juris, this Court has opted for its publication because it represents the last available opportunity to acknowledge the splendid work consistently provided by outgoing law clerk Kevin Bennardo during the past year. For a more representative appreciation of the substance and style contributed by Kevin, an opinion such as Schrock v. Learning Curve Int'l, Inc., 531 F.Supp.2d 990 (N.D., Ill. 2008) better demonstrates how he has regularly gone beyond the advocates' submissions to convey a keen insight into the

12

_____
Milton I. Shadur
Senior United States District Judge

Date: September 2, 2008

---

proper ratio decidendi for a decision.  This Court hastens to add
(as it invariably does when it is appropriate to pay such a
tribute to one of its exemplary law clerks) that it has carefully
reworked each sentence in this and other draft opinions produced
by Kevin, as well as having read each cited case, so that each
end product is this Court's own.  If then any errors have found
their way into any final version, the sole responsibility must be
laid at this Court's doorstep and not Kevin's.

13